UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | |
|---|---|
| UNITED ENERGY DISTRIBUTORS, INC., ) | Civil Action No.: 1:07-cv-2644-RBH |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| CONOCOPHILLIPS COMPANY, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

This matter is before the court upon Defendant ConocoPhillips Company's [Docket Entry #11] motion to dismiss. For the reasons stated below the court denies Defendant's motion.[1]

**Background**

On July 27, 2007, Plaintiff United Energy Distributors, Inc. ("United Energy") filed a complaint against Defendant ConocoPhillips Company ("ConocoPhillips") alleging three causes of action: 1) violation of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801, *et seq.*; 2) bad faith pricing under S.C. Code Ann. § 36-2-305; and 3) violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code Ann. §§ 39-5-10 to -170.

The facts, as alleged by United Energy's complaint, are as follows:

United Energy is a wholesale distributor of motor fuels and other refined petroleum products (sometimes referred to as a "jobber" or "petroleum marketer"). [Complaint, at ¶ 3, Docket Entry #1]. United Energy markets motor fuels and other petroleum products, including

---

[1] Pursuant to Local Rule of Civil Procedure 7.08, the district court may determine motions without a hearing. The court believes that the issues are thoroughly briefed and adequately presented in the materials before the court.

motor fuels under the "Phillips" and "Conoco" brands, at wholesale to independent service station dealers and other customers. *Id*.

ConocoPhillips, which was formed in 2002 following the merger of Conoco, Inc. ("Conoco") and Phillips Petroleum Company ("Phillips"), is engaged in the refining, marketing, distribution, and sale of motor fuel products to wholesale distributors, such as United Energy. *Id*. at ¶ 4.

In July of 2001, United Energy entered into a Supply Contract with Phillips, under which Phillips, and later ConocoPhillips, supplied United Energy with Phillips and ConocoPhillips branded motor fuels[2] for resale to its customers. *Id*. at ¶¶ 5-8.

From approximately July 26, 2001, to July 31, 2006, ConocoPhillips or Phillips delivered branded motor fuels to United Energy under the terms of the Supply Contract. *Id*. at ¶ 10. However, sometime in late May or early June 2006, ConocoPhillips orally advised United Energy that it would cease supplying motor fuels under the Supply Contract effective June 20, 2006. *Id*. After extending the Supply Contract for approximately 30 days, ConocoPhillips made its last delivery of branded motor fuel under the Supply Contract on July 31, 2006. *Id*.

Count one of United Energy's complaint alleges that ConocoPhillips failed to comply with 15 U.S.C. § 2804 of the PMPA by failing to: 1) provide ninety (90) days prior notice of the non-renewal or termination of the Supply Contract; 2) provide written notice of the non-renewal or termination; 3) deliver the notice of non-renewal or termination by certified mail,

---

[2] Branded motor fuel means gasoline authorized for sale under the ConocoPhillips trademarks, trade names, and other brand identifications.

return receipt requested or by personal delivery; and 4) provide United Energy with grounds for the non-renewal or termination. *Id*. at ¶¶ 10, 26-27.  Accordingly, United Energy alleges that ConocoPhillips' acts or omissions constitute a wrongful termination or non-renewal of the franchise and a violation of the PMPA. *Id*. at ¶¶ 10, 28.

Counts two and three are generally based upon the allegations that ConocoPhillips unlawfully increased the price of motor fuel to United Energy and other distributors in violation of South Carolina Code Ann. § 36-2-305 and engaged in a course of conduct that constituted "unfair" or "deceptive" trade practices under SCUTPA.

In particular, the complaint alleges that on or about May 19, 2003, ConocoPhillips announced a modified business model to enhance the ConocoPhillips brand and increase volume sales. *Id*. at ¶ 12.  To implement the new business model, ConocoPhillips introduced a new supply agreement, the Branded Marketer Agreement ("BMA"), and a new incentive payment agreement, the Marketing Services Allowance Agreement ("MSA"). *Id*.

ConocoPhillips also introduced a new image and appearance model referred to as the "Oasis" image standard. *Id*. at ¶ 13.  Saving approximately $250-350 million in capital investment, ConocoPhillips elected to place the financial burden of re-imaging individual ConocoPhillips stations on the distributors. *Id*.  The cost of re-imaging ConocoPhillips stations with the Oasis image standard amounted to approximately $25,000 - $35,000 per re-imaged station. *Id*.  United Energy allegedly invested nearly $2,000,000 in re-imaging its ConocoPhillips branded service stations. *Id*.

Although the cost of re-imaging ConocoPhillips service stations fell upon the distributors, ConocoPhillips offered other financial incentives to distributors pursuant to the

terms contained in the MSA to, among other things, offset the cost to distributors of re-imaging ConocoPhillips service stations. *Id*. at ¶ 14. Under the MSA, ConocoPhillips agreed to pay incentives to the distributor based on the volume of branded motor fuel purchased by the distributor from ConocoPhillips. *Id*.

United Energy and other distributors were concerned that, despite ConocoPhillips' assurances regarding incentives in the MSA, ConocoPhillips would recover the incentive payments by increasing the price at the terminal for ConocoPhillips branded motor fuel (the "posted rack price"). *Id*. at ¶ 15. United Energy alleges that in May of 2003, in response to their concerns, ConocoPhillips made the first of repeated representations and assurances that it would not increase its posted rack price for ConocoPhillips branded motor fuel. *Id*. ConocoPhillips represented further that it would fund the MSA incentives through cost reductions and the elimination of old support programs. *Id*.

Relying upon the truthfulness of ConocoPhillips' representations, United Energy entered into a BMA and MSA with ConocoPhillips on March 18, 2004. *Id*. at ¶ 16. Under the BMA, United Energy purchased ConocoPhillips branded motor fuels for resale to ConocoPhillips branded retail service stations. *Id*. The price term contained in the BMA is an "open price term" within the meaning of S.C. Code Ann. § 36-2-305. *Id*. Under the open price term, ConocoPhillips determined the per gallon price for its motor fuels at the time of delivery. *Id*.

United Energy claims that ConocoPhillips, with full knowledge of its representations and assurances that it would not increase the posted rack price for ConocoPhillips branded motor fuels, began increasing its posted rack price sometime in 2005. *Id*. at ¶ 17. As a result, United Energy allegedly suffered monetary losses. *Id*. at ¶ 18.

Count two alleges that ConocoPhillips, in bad faith, increased the price of motor fuel to United Energy under the Distributor Agreement as a means of taking back the incentive payments it was obligated to pay to distributors, including United Energy, under the MSA. *Id*. at ¶ 31. Count two further alleges that ConocoPhillips' increases in price constitutes a failure to set the price of motor fuel sold to United Energy in good faith within the meaning of S.C. Code Ann. § 36-2-305. *Id*. at ¶ 32.

Count three alleges that ConocoPhillips' increases in the price of ConocoPhillips branded motor fuel, with the knowledge of the representations and assurances it had previously provided United Energy, is an act, practice, or method that is offensive to the public policy or is immoral, unethical, or oppressive and constitutes an unfair or deceptive act within the meaning of SCUTPA, S.C. Code Ann. §§ 39-5-10 to -170. *Id*. at ¶ 37. United Energy further alleges that ConocoPhillips' unfair or deceptive acts affect the public interest. *Id*. at ¶ 38.

United Energy seeks: 1) compensatory and punitive damages, together with recoverable costs and expenses, including attorneys' fees and expert witness fees, and interest on all unpaid amounts at the judgment rate, as provided under the PMPA; 2) treble damages, plus reasonable attorneys' fees and costs, as provided under SCUTPA; and 3) compensatory damages resulting from ConocoPhillips' alleged bad faith pricing under S.C. Code Ann. § 36-2-305.

### **Standard of Review**

When reviewing a motion made under Federal Rule of Civil Procedure 12(b)(6), the court must "accept all well-pleaded allegations in the plaintiff's complaint as true and draw all reasonable factual inferences from those facts in the plaintiff's favor." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). The plaintiff's "[f]actual allegations must be

enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 127 S.Ct. at 1969. A complaint attacked by a motion to dismiss will survive if it contains "enough facts to state a claim to relief that is plausible on its face." *Id*. at 1974; *see also*, *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008); *Self v. Norfolk Southern Corp.*, No. 07-1242, 2008 WL 410284, at *1 (4th Cir. February 13, 2008) (unpublished).

## Discussion

I.    <u>Count One (Petroleum Marketing Practices Act - 15 U.S.C. § 2804)</u>

In count one, United Energy alleges that ConocoPhillips violated the PMPA when it failed to provide adequate notice of its termination or non-renewal of the Supply Contract with United Energy in violation of 15 U.S.C. § 2804.

Title 15 U.S.C. § 2804 states in part:

> (a)    General requirements applicable to franchisor
>
> Prior to termination of any franchise or non-renewal or any franchise relationship, the franchisor shall furnish notification of such termination or such non-renewal to the franchisee who is a party to such franchise or such franchise relationship - -
>
>> (1) in the manner described in subsection (c) of this section; and
>>
>> (2) except as provided in subsection (b) of this section, not less than 90 days prior to the date on which such termination or non-renewal takes effect.
>
> . . .
>
> (c)    Manner and form of notification

6

> Notification under this section - -
>
>> (1) shall be in writing;
>>
>> (2) shall be posted by certified mail or personally delivered to the franchisee; and
>>
>> (3) shall contain - -
>>
>>> (A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor;
>>>
>>> (B) the date on which such termination or non-renewal takes effect; and
>>>
>>> (C) the summary statement prepared under subsection (d) of this section.

United Energy contends that ConocoPhillips' notice of non-renewal or termination, which was allegedly provided orally sometime in late May or early June 2006, was inadequate because the notice: 1) was not given 90 days prior to the termination or non-renewal of the Supply Contract; 2) was not in writing; 3) was not sent via certified mail or personal delivery; and 4) did not state the grounds for the non-renewal or termination.

ConocoPhillips argues that count one should be dismissed because United Energy does not assert any claims under the PMPA with regard to the 2004 Branded Marketer Agreement ("BMA"). ConocoPhillips insists that the 2004 BMA is the only valid and enforceable agreement that is subject to the PMPA. ConocoPhillips contends that the 2001 Supply Contract was superseded by the 2004 BMA; therefore, United Energy cannot state a claim for a violation of the PMPA with respect to the extinct 2001 Supply Contract.

United Energy argues in response that the 2004 BMA did not supersede the 2001

Supply Contract. United Energy essentially argues that there were two agreements, the 2001 Supply Contract and 2004 BMA, which were in effect at the same time and covered different matters. United Energy alleges that the Supply Contract remained in effect and was performed by the parties according to its terms. United Energy contends that the 2004 BMA only superseded other branded marketer agreements and the 2001 Supply Contract was not a branded marketer agreement.

United Energy also argues that the facts, as alleged in the complaint, establish the continued existence and validity of the 2001 Supply Contract beyond the date on which the parties entered the BMA. Paragraph 10 of the complaint alleges that "[f]rom approximately July 26, 2001, to July 31, 2006, the defendant ConocoPhillips, or Phillips, its predecessor-in-interest, delivered branded motor fuels to United Energy under the terms of the Supply Contract."

Simply stated, the issue raised by ConocoPhillips' motion to dismiss is whether the parties intended for the 2004 BMA to supersede the 2001 Supply Contract. That particular issue is not appropriate for disposition on a motion to dismiss under Rule 12(b)(6). One may argue that the integration clause contained in the BMA appears to be limited to other branded marketer agreements and the 2001 Supply Contract does not, on its face, appear to be a branded marketer agreement.[3]

More importantly, the facts alleged by United Energy in their complaint indicate that

---

[3] On a motion to dismiss under Rule 12(b)(6), the court may properly consider a contract that is integral to the allegations contained in the complaint, which is referenced in both the complaint and the plaintiff's briefing in response to the motion to dismiss, and which the plaintiff had possession of and relied upon in framing his complaint. *Tetrev v. Pride Int'l, Inc.*, 444 F. Supp. 2d 524, 529 (D.S.C. 2006).

the parties continued to perform under the Supply Contract until July 31, 2006. The complaint alleges that ConocoPhillips wrongfully terminated or non-renewed the Supply Contract when it failed to comply with the notice requirements of the PMPA for termination or non-renewal of a franchise. [Complaint, at ¶¶ 10, 20-28, Docket Entry #1]. Accordingly, taking the facts alleged in the complaint as true, the complaint states facts sufficient to allege a violation of the PMPA that is plausible on its face. *See Twombly*, 127 S.Ct. at 1974.

II.     Count Two (Bad Faith Pricing - S.C. Code Ann. § 36-2-305)

Count two alleges that ConocoPhillips increased the price of motor fuel to United Energy under the Distributor Agreement in bad faith as a means of taking back the incentive payments it was obligated to pay to United Energy under the MSA. [Complaint, at ¶ 31, Docket Entry #1]. Count two further alleges that ConocoPhillips' increases in price constitutes a failure to set the price of motor fuel sold to United Energy in good faith within the meaning of S.C. Code Ann. § 36-2-305.[4] *Id.* at ¶ 32.

Section 36-2-305, entitled Open Price Term, provides that:

>   (1)     The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is reasonable at the time for delivery if
>           (a)     nothing is said as to price; or
>           (b)     the price is left to be agreed by the parties and they fail to agree; or
>           (c)     the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.
>   (2)     *A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.*

---

[4]     ConocoPhillips does not appear to dispute that the price term at issue in the BMA is an open price term within the meaning of § 36-2-305.

S.C. Code Ann. § 36-2-305 (emphasis added). Section 36-2-103(1)(b) defines "good faith" as, in the case of a merchant, honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade. S.C. Code Ann. § 36-2-103(1)(b). Honesty in fact is often referred to as the subjective component of good faith, while commercial reasonableness is referred to as the objective component of good faith. *See, e.g. Mathis v. Exxon Corp.*, 302 F.3d 448, 455-56 (5th Cir. 2002).

ConocoPhillips first argues that they are not bound by any alleged oral assurances or representations regarding promises not to increase the posted rack price for ConocoPhillips branded motor fuel. ConocoPhillips next argues that United Energy cannot state a claim for bad faith pricing under § 2-305 because ConocoPhillips' prices fell within the safe harbor provision.

The safe harbor provision, found in Official Comment 3 to § 2-305, provides that "[g]ood faith includes the observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant. (Section 2-103.) *But in the normal case a 'posted price' or a future seller's or buyer's 'given price,' 'price in effect,' 'market price,' or the like satisfies the good faith requirement*." S.C. Code Ann. § 36-2-305 cmt. 3 (emphasis added). In essence, Official Comment 3 provides that in the "normal case," where a buyer is charged the "posted price," "market price," or the like, the subjective component of good faith (honesty in fact) is immaterial.

ConocoPhillips maintains that this is the "normal case" contemplated by Official Comment 3 and because it charged United Energy its posted price at the time of delivery it meets the objective standard of good faith set forth in *Havird Oil Co. Inc. v. Marathon Oil*

*Co, Inc.*, 149 F.3d 283 (4th Cir. 1998). ConocoPhillips argues further that even if a subjective standard of good faith applied, which it does not concede, United Energy's allegations do not support finding a lack of good faith because they fail to allege that ConocoPhillips either discriminated in applying its posted price or tried to drive United Energy out of business or that the posted price was not commercially reasonable. In sum, ConocoPhillips contends that it is entitled to the safe harbor presumption of good faith.

United Energy responds that a "posted price" satisfies the good faith requirement of § 2-305 only in the "normal case," and that the facts alleged in the complaint remove this action from the realm of the "normal case." United Energy argues that the "normal case" is one in which the buyer alleges that the price is commercially unreasonable or unreasonably high. In such cases, if the price is the posted price, market price, or the like, good faith is presumed. However, when the allegation is that the price, although commercially reasonable, is fixed in bad faith, then such is not the "normal case" and the seller is not entitled to the presumption of good faith. In essence, United Energy argues that because their challenge is to the manner in which the price was set, as opposed to the amount of the price, ConocoPhillips is not entitled to the presumption of good faith and their actions must be reviewed under the objective standard of good faith (commercial reasonableness) and the subjective standard of good faith (honesty in fact).

There is authority that supports the positions of both United Energy and ConocoPhillips. United Energy's position is supported by the rationales in *Allapattah Servs. Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1308 (S.D. Fla. 1999), *Mathis v. Exxon Corp*, 302 F.3d 448 (5th Cir. 2002), and *Nanakuli Paving and Rock Co. v. Shell Oil Co., Inc.*, 664 F.2d 772 (9th Cir. 1981).

11

Most illustrative of Untied Energy's position is *Allapattah*, where the plaintiffs-dealers alleged that Exxon breached its Sales Agreements when it increased its motor fuel prices in bad faith as a means of passing the cost of credit card processing to the dealers in an effort to ultimately force some dealers out of business. 61 F. Supp. 2d at 1313. Exxon attempted to avail itself of the good faith presumption arguing that its "price in effect" was, by definition, a price set in good faith. *Id*. at 1320. Rejecting Exxon's argument, the court noted that the parties' dispute was not over the actual amount of the price Exxon charged, but rather over the manner in which the price was calculated. *Id*. at 1322. Therefore, the court concluded, the action was not the "normal case" and Exxon was not entitled to the presumption of good faith. *Id*. Accordingly, Exxon's duty of good faith to its dealers consisted of two components, honesty in fact (subjective component) <u>and</u> the observance of reasonable commercial standards of fair dealing in the trade (objective component). *Id*.

ConocoPhillips primarily relies upon *Havird Oil Co., Inc. v. Marathon Oil Co., Inc.*, 149 F.3d 283 (4th Cir. 1998); *Adams v. G.J. Creel and Sons, Inc.*, 465 S.E.2d 84 (S.C. 1995), and *Shell Oil Co. v. HRN, Inc.*, 144 S.W.3d 429 (Tex. 2004). Although *Havird* and *Adams* are cases interpreting S.C. Code Ann. § 36-2-305, those cases are not particularly helpful because they do not involve allegations that the price charged by the seller was set in bad faith. Rather, *Havird* and *Adams* involve allegations that the price set by the seller was commercially unreasonable. *See Havird*, 149 F.3d at 290 (stating "[t]he dispute here centers on the reasonableness of the price Marathon charged Havird for gasoline"); *Adams*, 465 S.E.2d at 278-79 (plaintiff contended price charged by defendant was unreasonable in violation of § 2-305). Neither case addresses the issue raised by this case.

However, in *Shell Oil Co. v. HRN, Inc.*, the Texas Supreme Court interpreted § 2.305 of the Texas Business and Commercial Code, which is virtually identical in all respects to the South Carolina statute involved in this case. 144 S.W.3d at 432-33. Unlike *Havird* and *Adams*, the plaintiff-dealers in *HRN, Inc.* did not contend that the price charged by the seller was commercially unreasonable, but alleged that the price charged was set in bad faith with the improper motive of running plaintiffs out of business in violation of § 2.305. *Id*. at 432. In rejecting plaintiffs' claims, the court provided the following analysis:

> "It is abundantly clear ... that the chief concern of the UCC Drafting Committee in adopting § 2-305(2) was to prevent discriminatory pricing-i.e., to prevent suppliers from charging two buyers with identical pricing provisions in their respective contracts different prices for arbitrary or discriminatory reasons."
>
> The Dealers themselves concede that Shell is not obligated to price its gasoline with their interests in mind or to protect them from competition. They further explain that their theory in this case does not turn on the DTW price set by Shell but rather on the reason why Shell chose to charge that price. Likewise, the court of appeals concludes that this is not the normal case because the price, although commercially in line with that charged by other refiners to their lessee dealers, may have been motivated by an improper underlying purpose to eliminate some dealerships.
>
> It is not apparent, however, why the intent behind a commercially reasonable, non-discriminatory price should matter for purposes of a breach of contract claim under section 2.305(b). Dealers do not contend that they are entitled to any particular price and do not disagree that Shell's DTW price is within the range charged by other refiners to their dealers. Thus, if these Dealers were charged the same DTW price by another refiner who did not have a similar plan to thin their ranks, presumably the price would pass muster under the Dealers' view of section 2.305. Premising a breach of contract claim solely on assumed subjective motives injects uncertainty into the law of contracts and undermines one of the UCC's primary goals-to "promot[e] certainty and predictability in commercial transactions."

13

> Beyond prohibiting discriminatory pricing, the drafters wished to minimize judicial intrusion into the setting of prices under open-price-term contracts. They understood that requiring sellers in open-price industries, such as the oil and gas industry, to justify the reasonableness of their prices in order to satisfy section 2.305 would "mean that in every case the seller is going to be in a lawsuit" and that every sales contract would become "a public utility rate case." The drafters reasonably foresaw that almost any price could be attacked unless it benefitted from a strong presumption. Thus, they adopted a safe harbor, Comment 3's posted price presumption, to preserve the practice of using "sellers' standard prices" while seeking "to avoid discriminatory prices."
>
> The reasoning in *Mathis* and the court of appeals in this case negates the effect of Comment 3's "safe harbor" by concluding that circumstantial evidence of "[a]ny lack of subjective, honesty-in-fact good faith" is sufficient to create an "abnormal" case in which the posted-price presumption no longer applies. *See Mathis*, 302 F.3d at 457. The effect is to allow a jury to determine in every section 2.305(b) case whether there was any "improper motive animating the price-setter," even if the prices ultimately charged were undisputedly within the range of those charged throughout the industry. *Id*. at 454. This result appears to conflict with the drafters' desire to eliminate litigation over prices that are nondiscriminatory and set in accordance with industry standards. Although the subjective element of good faith may have a place elsewhere in the Code, we do not believe this subjective element was intended to stand alone as a basis for a claim of bad faith under section 2.305. Rather we conclude that allegations of dishonesty under this section must also have some basis in objective fact which at a minimum requires some connection to the commercial realities of the case.

*HRN, Inc.*, 144 S.W.3d at 434-36 (some internal citations omitted).

The Texas Supreme Court, however, did not completely eliminate bad faith pricing claims in cases involving non-discriminatory, commercially reasonable prices. Although it concluded that "a price, commercially reasonable on its face, may nevertheless be applied in a dishonest fashion," the court placed an important limitation on such cases by requiring a commercial injury distinct from the price increase itself. *Id*. at 436. Thus, for a bad faith

pricing claim to proceed when, as here, the price is commercially reasonable on its face, there must be some commercial injury distinct from the price increase itself. *Id*.

Recognizing that this issue is before the court on a motion to dismiss, with no South Carolina authority on point, the court reserves ruling on whether ConocoPhillips is entitled to the safe harbor provision of § 2-305. ConocoPhillips' arguments are well-taken and the court finds the reasoning of the Texas Supreme Court in *Shell Oil Co. v. HRN, Inc.*, 144 S.W.3d 429, to be persuasive on the issue. However, it is worth noting that none of the primary cases upon which ConocoPhillips relies, *Havird*, *Adams*, and *HRN, Inc.*, were disposed of on a Rule 12(b)(6) motion. In *Havird*, Judge Duffy granted the wholesaler's renewed motion for judgment as a matter of law after a jury verdict in favor of the buyer. In *Adams*, the issue was ruled upon following a motion for directed verdict, and in *HRN, Inc.*, the issue was reached on a motion for summary judgment. Additionally, in *Adams*, then Justice Toal, noted in her dissent that "[t]he South Carolina Reporter's Comments to § 36-2-305 emphasize that once it is established that an open price contract exists, reasonableness and good faith are each jury questions." *Adams*, 465 S.E.2d at 87 (Toal, J. dissenting). No one disputes that an open price contract exists in this case.

Furthermore, it remains to be seen whether United Energy can prove a commercial injury distinct from the price increase. *See HRN, Inc.*, 144 S.W.3d at 436 (recognizing that a cause of action for bad faith pricing may exist where a price, commercially reasonable on its face, is applied in a dishonest fashion and results in a commercial injury distinct from the price increase itself). United Energy has alleged that ConocoPhillips made representations and assurances that the incentives paid under the MSA represented, in essence, compensation by

ConocoPhillips for its decision to offer no financial assistance to distributors in connection with converting each service station to the "Oasis" image. [Complaint, at ¶ 14, Docket Entry #1]. United Energy also alleged that ConocoPhillips, in bad faith, increased the price of motor fuel to United Energy under the Distributor Agreement *as a means of taking back the incentive payments it was obligated to pay distributors*, including United Energy, under the MSA. *Id*. at ¶ 31.

Although the court is specifically reserving its ruling on the issue of whether ConocoPhillips is entitled to the good faith presumption, for purposes of the present motion, United Energy's alleged loss of the value of the incentive payments due under the MSA, as a result of the price increases, *may* constitute a commercial injury distinct from the increase in price. The complaint can reasonably be interpreted to allege that United Energy lost the value of the incentive payments due under the MSA and was forced to carry the financial burden of re-imaging the service stations with no financial assistance or compensation from ConocoPhillips. Whether this alleged injury is commercially distinct from the price increase itself and whether ConocoPhillips is entitled to the good faith presumption are questions the court will address at a later date. However, taking United Energy's allegations as true, the court finds that the complaint sufficiently alleges a commercial injury distinct from the price increase itself. Accordingly, ConocoPhillips' motion to dismiss is denied as to count two.

III.    Count Three (South Carolina Unfair Trade Practices Act - S.C. Code. Ann. §§ 39-5-10 to - 170)

Count three alleges that ConocoPhillips' increase in the price of ConocoPhillips branded motor fuel, with the knowledge of the representations and assurances it had previously

provided United Energy, is an act, practice, or method that is offensive to the public policy or is immoral, unethical, or oppressive and constitutes an unfair or deceptive act within the meaning of SCUTPA, S.C. Code Ann. §§ 39-5-10 to -170. *Id*. at ¶ 37.  United Energy further alleges that ConocoPhillips' unfair or deceptive acts affect the public interest. *Id*. at ¶ 38.

ConocoPhillips contends that United Energy's SCUTPA claim should be dismissed because United Energy "has put forth no allegations whatsoever that the pricing by ConocoPhillips to [United Energy] had any impact on the public interest or that there is any likelihood for repetition of a deceptive act." [Memo in Support of Motion to Dismiss, at pg. 20, Docket Entry #11-2].

In order to bring an action under SCUTPA, the plaintiff must allege: 1) that the defendant engaged in an unfair or deceptive act in the conduct of trade or commerce; 2) that the plaintiff suffered actual, ascertainable damages as a result of the defendant's unfair or deceptive act, and 3) that the unfair or deceptive act had an adverse impact on the public interest. *See* S.C. Code Ann. § 39-5-140; *Daisy Outdoor Advertising Co., Inc. v. Abbott*, 473 S.E.2d 47, 49 (S.C. 1996).

The court finds ConocoPhillips' argument to be without merit.  The complaint clearly alleges that ConocoPhillips engaged in unfair or deceptive acts that adversely affected the public interest.  Accordingly, United Energy has alleged facts sufficient to state a SCUTPA claim that is plausible on its face. *See Twombly*, 127 S.Ct. at 1974.

## Conclusion

For the reasons stated above, ConocoPhillips' [Docket Entry #11] motion to dismiss is **DENIED**. ConocoPhillips' [Docket Entry #21] motion for a hearing is **MOOT**.

**IT IS SO ORDERED**.


Florence, SC                                                          s/ R. Bryan Harwell
September 30, 2008                                              R. Bryan Harwell
                                                                              United States District Judge